CLAYTON THOMAS FENNELL, Petitioner-Appellee,

*v.*

MARYLAND CASUALTY COMPANY and STANDARD GLASS COMPANY, Respondents-Appellants.

(*Knoxville,* September Term, 1960.)

Opinion filed March 10, 1961.

STUART F. DYE, KRAMER, DYE, McNABB & GREENWOOD, Knoxville, for appellants.

ALLEN M. ELLIOTT, Knoxville, for appellee.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

The question in this Workmen's Compensation case is whether there is a causal connection between the injury on July 25, 1957, to the low back of the employee, Clayton Thomas Fennell, and his death on April 23, 1959, from a form of hepatitis called acute yellow atrophy of the liver. The Chancellor held that there was such causal connection. His conclusion is challenged on appeal.

The Chancellor made the following findings which are supported by material evidence:

The deceased, Fennell, on July 25, 1957, fell and injured his low back. Conservative treatments were first administered by Dr. Frank Milligan of Jefferson City and by Dr. Herschel Penn, Knoxville, in an effort to avoid surgery. When the treatments failed to relieve his low back condition. Dr. Penn performed a surgical operation on the low back on April 3, 1958. Fennell was discharged April 16, 1958, from the hospital but continued under the care of his physicians until discharged by them on February 18, 1959, with a 20% permanent partial disability to the body as a whole. At the time Mr. Fennell was hospitalized for surgery, Dr. John Avera, at the in-

stance of Dr. Penn, was called in for consultation. He reported to Dr. Penn that surgery was feasible and the operation was performed.

When it appeared that the deceased was having hallucinations and that it was difficult to restrain him, Dr. Avera treated him for delirium tremens, first administering chloral hydrate, and afterwards prescribed thorazine, which was given to reduce agitation so that he could be properly nursed.

The evidence, both by Dr. Avera and Mrs. Katherine Fennell, is to the effect that the deceased drank whisky over the week-ends and at various times to relieve his back injury and that whisky relieved him more than anything else. No prescription for the continued taking of thorazine or whisky was prescribed by Dr. Avera when the deceased was discharged, because he had recovered from the delirium tremens. While in the hospital, the deceased was given a considerable amount of thorazine and it is revealed by Dr. Avera that whisky would have the same effect as thorazine. It is also established by Dr. Penn that he continued the giving of pain-killers, such as codine, caffeine and aspirin but that also thorazine was given for the relief of a nervous condition.

On July 7, 1958, an x-ray was taken and the fusion in the back found to be good.

On October 8, 1958, the deceased came in and he was given compazine for a nervous condition but Dr. Penn testified that it had no connection with the operation but that the deceased complained of pain, both in his left leg and in his lower back.

On February 17, 1959, Dr. Penn reported a satisfactory recovery and his permanent partial disability valuated at 20%.

The evidence shows that the deceased after his discharge suffered continuously; that he was forced to lie down on his back at various times to secure partial relief and that both his wife and a friend would rub his back and hot water treatments were used. He carried a broom stick for support and drank whisky from time to time to relieve the pain. This whisky was taken in connection with thorazine which, when the supply given him by Dr. Penn had been exhausted, was obtained by him in some manner from some source not revealed. Numerous witnesses, however, testified that he never took enough whisky to class him as an alcoholic or ever to be found under its influence to the extent that it was noticeable to Rev. Churchwell, his pastor, or to his father, or to (other witnesses who testified).

On April 20, 1959, which was approximately a year after the surgery has been performed by Dr. Penn, but only 68 days after he had been permanently discharged by Dr. Penn, the deceased entered Milligan Clinic; and on April 23, 1959, died, the death certificate reciting from "acute yellow atrophy of liver".

The Chancellor further found:

"The medical testimony is to the effect that there is no connection between the decedent's injury and the acute hepatitis which caused his death. Several physicians have testified and no cause or this liver disease has been given except that in instances it has been caused by the taking of thorazine and by the drinking of whisky. The best, and the only evidence, available for the considera-

tion of this Court is that it was caused by the taking of thorazine and whisky in quantity sufficient to give deceased some relief from his pain."

We think the foregoing quoted matter is not a correct interpretation of the medical evidence. The testimony of Drs. Muncy and Brimi, infra, explains when or how these tranquilizer drugs and the whisky may become fatal.

Now, at least twice in the findings of the Chancellor there appears a statement that at the time the patient was discharged by Dr. Penn he was given a quantity of thorazine. If the time of discharge referred to is meant discharge from the hospital, then the only evidence of Dr. Penn having given anything at all at that time is Dr. Penn's own statement that when the patient left the hospital he did not give him or prescribe thorazine but suggested that he take Bufferin or aspirin for pain and that when he returned to the Clinic on October 8, 1958, complaining of nervousness and continued pain, he did give him one dozen 15 mg. compazine spansules (capsules) to take every morning. The evidence is, however, that no prescription was given the deceased after he was discharged from the care of Dr. Penn.

It is true, however, that the record does not reflect that either Dr. Penn or Dr. Avera, as found by the Chancellor, gave the patient any warning as to any possible danger of taking thorazine and/or whisky, insofar as it might cause the development of hepatitis of any form. It would seem timely at this point, however, to bring out the scientific testimony of Dr. Estle P. Muncy, who saw Mr. Fennell at the hospital 3 days before he died of hepatitis, and Dr. Robert J. Brimi, who never saw the deceased. Their testimony is quite interesting and enlightening.

They said that pain or suffering itself would have no effect on the liver, but the thing or things a person might do because of the pain could definitely affect the liver; that neither whisky nor thorazine will cause this disease, yellow atrophy of the liver, (acute necrotic hepatitis) except under a certain condition. That condition is that the subject person is in a rundown condition, i. e., suffering from malnutrition, leukemia or any other thing causing a debilitated condition of the body; that this patient was suffering from malnutrition.

In view of that testimony and in view of the fact that the record does not show that Mr. Fennell was suffering from malnutrition during and at the time of his final discharge in February, 1959, it would seem to be stretching the point somewhat to intimate that Drs. Penn and Avera were in any way remiss in their professional duty to give a warning about whisky or thorazine.

It seems to this Court fair to say there existed a causal connection between the original injury and the disease which was fatal to this employee. There is no question that as a result of the injury this man suffered great and continual pain as a result of the admitted injury; that as a result of the pain he was not able to get his normal sleep and there is evidence that frequently he would be unable to eat a meal; that he had a serious operation which was successful so far as the operation was concerned but which apparently, according to the record, wholly failed to relieve him of his suffering; that regardless of whether thorazine and compazine were given him actually as tranquilizers rather than as pain-killers, nevertheless according to the testimony of the widow it is evident that the two of them thought that those drugs were remedies for pain and the widow testified that when

he would take those drugs without getting sufficient relief he would then take whisky because he had found that whisky gave him the most relief of anything at all, the proof showing that he took about 7½ ounces of whisky per day.

■ Respective counsel have made a diligent search for spotted cow cases and have been unable to find any, the same is true of the efforts of the Court. It seems to this Court, however, that the nearest statement of principles applicable would be 99 C.J.S. Workmen's Compensation sec. 167, p. 551, wherein it is said:

> *"Weakened resistance.* A disease resulting from weakened resistance of an employee due to his employment is not compensable as a disease resulting from an injury or accident; nor is a disease compensable which follows an employee's weakened resistance after an accident where there is no clear causal connection. A disease 'results proximately from the accident,' however, if the disease is induced by lowered resistance proximately caused by the accident; and *a statute barring compensation for lowered resistance does not preclude an award where lowered resistance from the original injury intervenes between the injury and the final result, and the final result is traceable to the injury by way of the lowered resistance."* (Emphasis ours.)

The last sentence of the above quoted matter is based upon *Bratz v. Harry Maring, Jr., Inc.,* 116 Conn. 186, 164 A. 388, in which the sequence was a knee injury, operation, continued pain, tuberculosis of the bone, then finally, pulmonary tuberculosis which was fatal.

██ It must be conceded that the question in this case is close, partly so because it is unusual, but giving our statute a liberal construction as we are required to do, it would seem that where this injured man suffered this long, continued and excruciating pain, found that neither the operation did him any good nor did the drugs that he and his wife thought were given at least partly for pain relief, gave him such relief and that whisky, a well known home remedy throughout the ages, did give him the best relief, that he did not know that it was dangerous to his life to take either the drugs or the whisky when he was suffering from malnutrition and that the scientific undisputed evidence is that these items are dangerous and fatally so only when the body is in rundown condition which causes the liver cells to atrophy, then it seems that there is a reasonable causal connection between the original injury and the final occurrence of death.

We have examined all of the cases cited in the respective briefs, but a review of them here would be of no assistance on the facts of this case.

We so hold and affirm the decree of the Chancellor.

All concur.